STATE OF CONNECTICUT *v.* ROBERT PRATT, JR.
(14926)

Callahan, Borden, Norcott, Katz and Palmer, Js.

Argued September 20—decision released December 26, 1995

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Susann E. Gill*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Jonathan C. Benedict*, assistant state's attorney, for the appellee (state).

NORCOTT, J. After a jury trial, the defendant, Robert Pratt, Jr., was found guilty of one count each of felony murder in violation of General Statutes § 53a-54c,[1] manslaughter in the first degree by reckless indifference in violation of General Statutes § 53a-55 (a) (3)[2] and carrying a pistol without a permit in violation of General Statutes § 29-35.[3] The trial court combined the felony

[1] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] General Statutes § 53a-55 provides in relevant part: "Manslaughter in the first degree: Class B felony. (a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[3] General Statutes § 29-35 provides in relevant part: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry

murder and manslaughter convictions into a single murder conviction[4] and imposed a thirty-five year sentence. The court also imposed a five year consecutive sentence on the weapons conviction, for a total effective sentence of forty years. The defendant appeals from these judgments.[5]

On appeal, he claims that the trial court improperly: (1) denied his request for access to and the opportunity to elicit testimony regarding a key state witness' juvenile records; (2) denied his request for access to that same witness' juvenile court psychological and psychiatric records; and (3) instructed the jury regarding the process of drawing inferences from circumstantial evidence in violation of the defendant's federal and state constitutional guarantees of due process. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the early afternoon of June 29, 1992, David

---

any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] See *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

[5] General Statutes § 51-199 (b) provides: "The following matters shall be taken directly to the supreme court: (1) Any matter brought pursuant to the original jurisdiction of the supreme court under section 2 of article sixteen of the amendments to the constitution; (2) an appeal in any matter where the superior court declares invalid a state statute or a provision of the state constitution; (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years; (4) review of a sentence of death pursuant to section 53a-46b; (5) any election or primary dispute brought to the supreme court pursuant to section 9-323 or section 9-325; (6) an appeal of any reprimand or censure of a probate judge, pursuant to section 45a-65; (7) any matter regarding judicial removal or suspension pursuant to section 51-51j; (8) an appeal of any decision of the Judicial Review Council pursuant to section 51-51r; (9) any matter brought to the supreme court pursuant to section 52-265a; (10) writs of error, pursuant to section 52-272; and (11) any other matter as provided by law."

O'Hare was shot and killed while attempting to deliver a pizza to 99 Grant Street in Bridgeport on behalf of his employer, Stratford Pizza. On the day of the shooting, the defendant telephoned Stratford Pizza from the apartment of his girlfriend, Shakira Montgomery, located on Shelton Street in Bridgeport, and placed an order, and because Stratford Pizza was reluctant to deliver to Montgomery's Shelton Street address, the defendant requested that the order be delivered to 99 Grant Street. The defendant left the apartment in order to pick up the delivery but returned approximately thirty minutes later, telling Montgomery that the deliveryman had not appeared. The defendant called Stratford Pizza to inquire concerning the delivery and was told that O'Hare was just about to leave. The defendant again left to accept the pizza delivery, this time accompanied by two young men, Reggie Boyd and Cameron Graham, both of whom were fourteen years old. Ultimately, the group confronted O'Hare as he sat in his parked car in front of 99 Grant Street. In an attempt to rob O'Hare, the defendant produced a handgun, pointed it at O'Hare and shot him as he attempted to drive away.

After the shooting, the three youths split up and fled. The defendant returned to Montgomery's apartment and called Stratford Pizza to request that the delivery be cancelled. During the call, Atixhe Zeko, an employee of Stratford Pizza, informed the defendant that the delivery should have been made long ago. Later, after the police had informed Zeko that O'Hare had been shot, Zeko called the defendant and asked whether the pizza order had in fact been delivered. The defendant replied with an answer that sounded like "yes." Zeko then informed the defendant that the deliveryman had been shot, at which point the defendant quickly hung up.

Later that day, the three young men who had confronted O'Hare were at Montgomery's apartment. Also

present in the apartment were Kevidous "Kiki" McCray, Earl "June" Atkins and two of Montgomery's cousins, Tremayne O'Brien and Keyanna Hill. While Boyd, Graham and the defendant argued about the shooting, Graham called the defendant "stupid" for having shot O'Hare. The defendant said that he shot O'Hare because the victim would not give him the money and was trying to "test" him. The defendant, however, had also told Montgomery that the gun "went off" when his hand jerked after O'Hare drove over his foot in an attempt to escape.

The following day, the police questioned Boyd and informed him that the defendant had identified him as the shooter. Boyd subsequently gave a sworn statement identifying the defendant as the shooter. Throughout the course of trial, one of the theories put forth by the defendant was that it was Boyd, not he who had shot O'Hare.

No murder weapon was ever found, but ballistics tests conducted by the state indicated that a rather uncommon, top-loading, .38 caliber Grendel semiautomatic pistol was among the possible murder weapons. At trial, Montgomery testified that on the day of the shooting, the defendant had possessed a top loading handgun.

I

The defendant first claims that the trial court's refusal (1) to order discovery of the juvenile arrest records of Boyd and (2) to allow the defendant to elicit testimony regarding the details of an arrest documented therein, violated his federal and state constitutional rights of confrontation[6] and, consequently, his rights to

---

[6] Although the defendant purports to present an independent state constitutional analysis, nothing in that analysis suggests a right of confrontation that is broader under the state constitution than under the federal constitution.

present a defense, to due process and to a fair trial. We disagree.

The following additional facts are relevant to this claim. Prior to trial, in August, 1992, the trial court, *Gormley, J.*, had denied the defendant's motion for discovery and inspection of the juvenile and youthful offender records of arrests, convictions or pending cases for all the state's witnesses. Again, prior to trial, in January, 1993, Boyd was arrested in connection with a car chase that culminated in his pointing a loaded Grendel .38 caliber semiautomatic pistol at Greenwich police officer Pam Gustovich.[7] After learning of this event, the defendant filed a supplemental motion for discovery, specifically requesting all information in the state's possession relating to Boyd's arrest by the Greenwich police in January, 1993. His request also included all other information relating to Boyd tending to exculpate the defendant, namely, felony convictions, prior bad acts tending to show a lack of veracity, pending criminal charges, and evidence of any other acts similar to the homicide in the present case that might be considered "signature" offenses.

The trial court who heard the defendant's supplemental discovery motion, *Damiani, J.*, denied the defendant's request for access to Boyd's juvenile arrest records, having determined that Boyd had subsequently possessed and used the same make of weapon as that used in shooting O'Hare was not relevant to the issue of whether the defendant had shot O'Hare. The court found that the evidence did not rise to the level required to characterize the two incidents as signature offenses, and because it was remote and irrelevant, the court refused to order its disclosure. The court noted, how-

---

[7] It was later determined, and conceded by the defendant, that the Grendel .38 pistol involved in the Greenwich incident was not the weapon involved in the shooting in the present case.

ever, that if, in fact, Boyd did testify, the defendant would receive copies of his felony convictions and would be allowed to cross-examine him regarding prior bad acts and pending criminal charges.

At trial, the defendant notified the court that he intended to call Gustovich as a witness for the purpose of establishing that Boyd had possessed a Grendel pistol six months after the shooting of the victim in the present case. The state responded with a motion in limine, claiming that the evidence was irrelevant. During arguments on the motion, the defendant conceded that the Grendel pistol involved in the Greenwich incident was *not* the murder weapon, and also that he was not offering the evidence to impeach Boyd's credibility on a collateral matter.[8] The defendant instead argued that Boyd's possession of *a* Grendel .38 pistol six months after the shooting was relevant to the issue of whether he had been in possession of *the* pistol used in the shooting in the present case, based on the fact that a Grendel is an uncommon make of pistol. The trial court, *Maiocco, J.*, determined that this evidence was remote, irrelevant and without probative value. Accordingly, the trial court refused to allow the defendant to elicit testimony from Gustovich regarding Boyd's possession of a Grendel pistol during the Greenwich incident.

On appeal, the defendant claims that these rulings, denying him access to Boyd's juvenile arrest records and denying him the opportunity to elicit testimony

[8] During cross-examination, in response to defense counsel's question "Did you ever carry *the* Grendel pistol?" Boyd replied, "No, sir, I never carried." (Emphasis added.) In his briefs and at oral argument in this court, the defendant has referred to this exchange and has characterized it as a denial by Boyd that he had ever carried any type of Grendel pistol, and thus inconsistent with the fact that Boyd had possessed a Grendel pistol during the Greenwich incident. In order to clarify any ambiguity on this issue, we note that this testimony is not implicated in this appeal because the defendant, during trial, expressly disavowed this ground of admissibility, and therefore abandoned this claim on appeal.

regarding Boyd's arrest for possession of a Grendel pistol in January, 1993, in the Greenwich incident, violated his constitutional right of confrontation. He argued that the rulings impermissibly limited his rights to elicit testimony relevant to Boyd's bias and motive. We note at the outset that the defendant did not raise this theory of relevance at trial. With regard to his pretrial supplemental discovery motion, the defendant argued to the court only that the Greenwich incident was relevant as a signature crime. In arguing the admissibility of testimony concerning this incident at trial, however, the defendant claimed only that because the Grendel is an unusual make of pistol, the incident was relevant to show that Boyd may have possessed the Grendel used to murder O'Hare. This latter theory appears to be a reformulation of the signature crime argument advanced prior to trial.[9] On appeal, for the first time, he argues that Boyd's involvement in the Greenwich incident is relevant to his motive or his bias to testify falsely concerning the defendant's involvement in the shooting in the present case.

We will not ordinarily review a trial court's evidentiary rulings on grounds not raised in the trial court. See *State* v. *Braman*, 191 Conn. 670, 684–85, 469 A.2d 760 (1983); *State* v. *Manning*, 162 Conn. 112, 118, 291 A.2d 750 (1971). The defendant, however, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In accordance with *Golding*, a defendant may prevail on an unpreserved claim of constitutional error only by meeting four conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harm-

---

[9] The defendant does not challenge this evidentiary ruling in this appeal.

lessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. Under *Golding* review, this court is free to respond to the defendant's claim "by focusing on whichever condition is most relevant in the particular circumstances." Id., 240. We conclude that the defendant's claim fails to satisfy the third prong of *Golding,* and therefore he cannot prevail on this claim.[10]

Our analysis of the defendant's claim begins with the axiom that the defendant is entitled to confront and cross-examine fairly and fully the witnesses against him. U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8; *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas,* 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Barnes,* 232 Conn. 740, 745–46, 657 A.2d 611 (1995); *State* v. *Hackett,* 182 Conn. 511, 517, 438 A.2d 726 (1980); *State* v. *Jones,* 167 Conn. 228, 232, 355 A.2d 95 (1974); *State* v. *Luzzi,* 147 Conn. 40, 46, 156 A.2d 505 (1959). "The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examina-

[10] At oral argument, the defendant raised for the first time two additional grounds in support of his claims regarding access to Boyd's juvenile arrest records and the opportunity to elicit testimony regarding the Greenwich incident. First, he attempted to buttress his claim for access by arguing that the records could also have been used for the purpose of impeachment by cross-examination regarding pending juvenile charges in addition to pending criminal charges. Second, he claimed that the exclusion of this evidence at trial prevented him from laying a foundation to show that the witness had a habit of carrying Grendel pistols. Evidence of a regular practice or "habit" on past occasions permits an inference that the practice was followed on a similar occasion. *Puro* v. *Henry,* 188 Conn. 301, 312, 449 A.2d 176 (1982); *State* v. *Hubbard,* 32 Conn. App. 178, 185, 628 A.2d 626, cert. denied, 228 Conn. 902, 634 A.2d 296 (1993); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.6.2. Because he neither raised these grounds of admissibility at trial, nor briefed them on appeal, we decline to review them. See *Gorra Realty, Inc.* v. *Jetmore,* 200 Conn. 151, 171, 510 A.2d 440 (1986).

tion is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, [supra, 318] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Barnes*, supra, 746. "Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. *State* v. *Shipman*, 195 Conn. 160, 163, 486 A.2d 1130 (1985); 1 C. McCormick, [Evidence (4th Ed. 1992)] § 33, p. 112. The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . ." *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993).

"This right is not absolute; *Chambers* v. *Mississippi*, [supra, 410 U.S. 295]; *State* v. *Talton*, [197 Conn. 280, 284, 497 A.2d 35 (1985)]; but may bow to other legitimate interests in the criminal trial process. *Chambers* v. *Mississippi*, supra, 295; *State* v. *Vitale*, 197 Conn. 396, 401, 497 A.2d 956 (1985); *State* v. *Mastropetre*, 175 Conn. 512, 521, 400 A.2d 276 (1978). Such an interest is the trial court's right, indeed, duty, to exclude irrelevant evidence. *State* v. *Mastropetre*, supra, 521; *State* v. *Talton*, supra, 283–85; *State* v. *Randolph*, 190 Conn. 576, 594, 462 A.2d 1011 (1983); *State* v. *Johnson*, [190 Conn. 541, 551, 461 A.2d 981 (1983)]; *State* v. *Gaynor*, 182 Conn. 501, 509 n.8, 438 A.2d 749 (1980)." (Internal quotation marks omitted.) *State* v. *Franko*, 199 Conn. 481, 488, 508 A.2d 22 (1986). "The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-

examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Citations omitted; internal quotation marks omitted.) *State* v. *Barnes*, supra, 232 Conn. 746–47.

The defendant's sole constitutional claim on this issue is that his inability to inquire into Boyd's involvement in the Greenwich incident violates his constitutional right of confrontation. He argues that Boyd's involvement in the Greenwich incident was relevant because it obviously "created a strong motive for him to lie about possessing a different Grendel pistol at the scene of the shooting at issue here." It is not obvious to us, however, why Boyd's involvement in the Greenwich incident would motivate him to testify falsely against the defendant. The trial court determined, and the defendant does not challenge, that the incidents were not similar enough to be characterized as "signature crimes," and, therefore, evidence that Boyd possessed a Grendel pistol during the Greenwich incident could not be offered for the purpose of showing that it was likely that he possessed the Grendel pistol used in shooting the victim in the present case. The defendant was unable, either in his brief or at oral argument before this court, to offer any logical explanation of how Boyd's possession of a different Grendel pistol six months after the shooting of O'Hare furnished a motive for him to testify falsely.[11] Consequently, we conclude

[11] In fact, it is clear from the record that the defendant was given ample opportunity to cross-examine Boyd effectively. The defendant was allowed to cross-examine Boyd regarding any pending charges against him, inconsistencies between his testimony and that of other state witnesses, and any

that the evidence the defendant proffered was not relevant to Boyd's motive or bias.

The defendant's claim "misperceives the scope of a criminal defendant's right to confront and cross-examine witnesses against him." *State* v. *Franko*, supra, 199 Conn. 488. Because the defendant has failed to establish how Boyd's possession of a Grendel pistol during the Greenwich incident is relevant to his bias or motive to testify falsely, he cannot succeed on the claim that his constitutional rights were violated when testimony as to that fact was excluded. Accordingly, we conclude that the defendant may not prevail on his claim of constitutional impropriety.

II

The defendant's next claim is that the trial court's denial of his request for direct access to Boyd's juvenile court psychiatric and psychological records violated his constitutional rights to due process and confrontation under the fifth, sixth and fourteenth amendments to the federal constitution, and article first, § 8, of our state constitution. We disagree.

The defendant sought, for impeachment purposes, direct access to any psychiatric or psychological records arising out of Boyd's contact with the juvenile justice system. He subpoenaed those records,[12] and called as witnesses both the state's advocate and the juvenile public defender who had represented Boyd in his juvenile case.[13] Thereafter, Boyd permitted the trial

inconsistencies between his current testimony and his prior statement. Furthermore, the defendant was permitted to inform the jury that at the time Boyd gave his original statement to the police, in which he implicated the defendant, he was aware that the defendant had already given a statement implicating Boyd.

[12] The information that the defendant sought was subject to at least two statutory privilege protections; General Statutes §§ 46b-124 (juvenile court files); and 52-146e (communications between psychiatrist and patient).

[13] Both the state's advocate and the public defender reviewed the records and, although the latter did not describe them for the court, the state's

court to conduct an in camera review of the records.[14] After reviewing the records, the court concluded that there was nothing in them that was probative of Boyd's "capacity to relate the truth or observe, recollect, or narrate relevant occurrences." Accordingly, the court denied the defendant direct access to these records.

The procedure governing a criminal defendant's access to a witness' privileged records is now well established in this state. "If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that 'there is a reasonable ground to believe' that the failure to produce the records would likely impair his right to impeach the witness. *State* v. *Pierson*, [201 Conn. 211, 225, 514 A.2d 724 (1986)]; *State* v. *Esposito*, 192 Conn. 166, 179, 471 A.2d 949 (1984). If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken."[15] *State* v. *D'Ambrosio*, 212 Conn. 50, 58, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990). The procedure reflects a deliberate and careful balancing of the defendant's right

advocate testified that the records were a "standard juvenile workup" that did not contain material probative of Boyd's ability to comprehend, know or relate the truth.

[14] The sealed records became court exhibit 1, which was filed as part of the record in this case.

[15] In the present case, the state argues that the defendant did not even make the requisite preliminary showing of materiality of the records regarding impeachable content. We need not address this point, however, since Boyd, in fact, after consultation with trial counsel, waived the privilege and allowed the trial court to conduct the in camera review.

to confrontation and cross-examination against the public policy in preserving confidentiality in such records.

The defendant first claims that the trial court misapplied the standard for an in camera inspection when it denied his request for access to Boyd's records, and consequently the court violated his federal constitutional right to due process. A trial court is to inspect confidential psychological or psychiatric records to determine whether, within its discretion, the material contained therein is "especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences." Id. Despite never having seen the records, the defendant presumes that the trial court must have improperly concluded that none of the information contained therein was of material impeachment value to the defendant. Having carefully reviewed the records in light of the appropriate standard, we are not persuaded that the trial court abused its discretion by denying the defendant's request for access to Boyd's psychiatric and psychological records.

The defendant further claims that as a matter of federal and state constitutional law, he must be allowed "direct access" to the records for his independent review despite the trial court's negative findings. He argues that our current practice of having a trial court review privileged records in camera is an inadequate substitute for a review by the defendant's advocate and that consequently this procedure violates his state and federal constitutional rights of confrontation and cross-examination and his right to due process. See *State* v. *Harris*, 227 Conn. 751, 773–80, 631 A.2d 309 (1993) (*Berdon, J.*, dissenting). In essence, the defendant urges us to disregard established federal precedent and to overrule our own recent, state constitutional precedent squarely addressing this very issue. We decline to do so, and reaffirm the procedure adopted for balancing

these interests as set forth in *State* v. *Harris*, supra, 765–69.

In *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), the United States Supreme Court rejected a confrontation clause claim virtually identical to that raised by the defendant in this case. The court emphasized that the confrontation clause of the federal constitution is implicated only "when there [is] a specific statutory or court-imposed restriction at trial on the scope of questioning." Id., 53–54. Further, the court stated that the right of cross-examination "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." Id., 53. The Supreme Court also rejected the same claim advanced under a due process analysis. The court held that a balancing procedure that involves an in camera inspection by a trial judge, after the defendant has established "a basis for his claim that [the records contain] material evidence"; id., 58 n.15; a procedure virtually identical to that employed in Connecticut practice, satisfies due process concerns when, as a result of that review, the trial court meets its duty to turn over to the defense only information that is material to the defense. Id., 57–58. The court's decision in *Ritchie*, therefore, disposes of the defendant's claims under the federal constitution.

The defendant advances the same claim with regard to our state constitution. In *State* v. *Harris*, supra, 227 Conn. 768, however, this court adopted the reasoning of *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 39, in resolving Harris' direct access claim regarding confidential personnel records of a witness under our state constitution's confrontation clause. Recognizing the sensitivity of a person's confidential records, we accepted the posi-

tion of the United States Supreme Court that the procedure involving the trial court's in camera inspection of such records best protects both the witness' and the state's interest in preserving confidentiality against the defendant's interests in effectively cross-examining a witness. In *Harris*, we stated that "[w]e are not convinced that the trial court is unable to detect those materials in confidential records that must be disclosed in order to afford a defendant his state due process and confrontation rights." *State v. Harris*, supra, 768.

As a matter of general principle, a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. We will overrule our own precedent only for the most compelling reasons. See *Kluttz v. Howard*, 228 Conn. 401, 406, 636 A.2d 816 (1994); *State v. Somerville*, 214 Conn. 378, 384–85, 572 A.2d 944 (1990); *White v. Burns*, 213 Conn. 307, 335–36, 567 A.2d 1195 (1990); *State v. Castonguay*, 194 Conn. 416, 435, 481 A.2d 56 (1984); *Herald Publishing Co. v. Bill*, 142 Conn. 53, 62, 111 A.2d 4 (1955). The defendant presents no such compelling reason and adds nothing to the argument that we carefully considered and rejected in *Harris*. We continue to believe that the in camera approach represents the most effective and sensitive balance between the interests of the criminal defendant and private citizens who expect and rely on the confidentiality of their psychiatric records and communications. A criminal defendant does not have a right " 'to conduct a general fishing expedition' " into a witness' privileged records. *State v. Januszewski*, 182 Conn. 142, 172, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). Further, we have specifically considered the constitutionality of in camera inspections of privileged records in several contexts; see, e.g., *State v. Harris*, supra, 227 Conn. 767–68 (psychiatric and juvenile records, psychiatric records, and rape crisis center records); and we

have determined that this approach satisfies the defendant's right to confrontation under the Connecticut constitution. Id. We remain convinced that this procedure satisfies the constitutional rights of a criminal defendant.

We also note in this regard that in camera judicial review of a victim's privileged records currently represents the most common method of balancing statutory privileges against the defendant's trial rights. See, e.g., *Jordan* v. *State,* 607 So. 2d 333, 335 (Ala. Crim. App. 1992); *Gunter* v. *State,* 313 Ark. 504, 512–13, 857 S.W.2d 156 (1993); *People* v. *District Court,* 743 P.2d 432, 436 (Colo. 1987); *People* v. *Foggy,* 121 Ill. 2d 337, 349–50, 521 N.E.2d 86 (1988); *Goldsmith* v. *State,* 337 Md. 112, 133–35, 651 A.2d 866 (1995); *Commonwealth* v. *Bishop,* 416 Mass. 169, 179–80, 617 N.E.2d 990 (1993); *People* v. *Stanaway,* 446 Mich. 643, 678–79, 521 N.W.2d 557 (1994); *State* v. *Cressy,* 137 N.H. 402, 413, 628 A.2d 696 (1993); *State* v. *Kalakosky,* 121 Wash. 2d 525, 550, 852 P.2d 1064 (1993).

Interestingly, the Supreme Court of Massachusetts, recently affirmed the in camera procedure for gaining access to private records after it had experimented with the "direct access" approach in sexual assault trials. See *Commonwealth* v. *Bishop,* supra, 416 Mass. 179–80; *Commonwealth* v. *Stockhammer,* 409 Mass. 867, 882–84, 570 N.E.2d 992 (1991). Pertinent to that court's rejection of the direct access rule as applied to the victim's privileged records in sexual assault cases, a rule advocated by the defendant in the present appeal for all privileged records, is the following reflection: "Unlimited access, absent a showing that the records might contain relevant evidence, provides the defense with personal details that could humiliate the victim, but which may have no bearing on the trial. [*Commonwealth* v. *Bishop,* supra, 176.] Indeed, the routine disclosure of privileged records benefits neither the defendant

nor society. If victims fail to seek counseling or to speak openly when counseled, the defense will simply have no privileged records to review, and statutory assurances of confidentiality will become moot." E. Crowley, "*In Camera* Inspections of Privileged Records in Sexual Assault Trials: Balancing Defendants' Rights and State Interests Under Massachusetts's *Bishop* Test," 21 Am. J.L. & Med. 131, 151–52 (1995). We perceive no valid reason why this cogently expressed rejection of the direct access approach is not also applicable to the records at issue in the present case.

Accordingly, we reject the defendant's invitation to abandon our recent precedent in *Harris*. Moreover, he cannot prevail as a matter of federal constitutional law. Consequently, his claim must fail.

## III

The defendant's final claim requires little discussion. He argues that certain parts of the trial court's jury instructions regarding the nature of circumstantial evidence and the process of drawing inferences from circumstantial evidence violated the constitutional prohibition against mandatory presumptions as set forth in *Sandstrom* v. *Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).[16] The defendant concedes that he did not take an exception to the challenged language, but now seeks to prevail under our *Evans-Golding* doctrine. *State* v. *Evans*, 165 Conn. 61, 327

---

[16] The following language excerpted from the trial court's charge on circumstantial evidence is challenged: "If you find certain facts have been proven, if the only reasonable inference to be drawn from the existence of those facts is that the accused committed the crime or crimes charged, then it is your duty to draw that inference and find him guilty.

\* \* \*

"If, however, you find from all the facts proven beyond a reasonable doubt that the only reasonable inference to be drawn from the existence of those facts is that the accused committed the crime or crimes charged, it is your duty to draw that inference and to find him guilty."

A.2d 576 (1973); *State* v. *Golding,* supra, 213 Conn. 239–40.[17] Applying this standard, we conclude that this claim fails the third prong of *Golding.*

We do not find a *Sandstrom* type violation here. "To determine whether the court's instructions were improper, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . *State* v. *Hernandez,* [218 Conn. 458, 465, 590 A.2d 112 (1991)]; *State* v. *Tatum,* [219 Conn. 721, 734, 595 A.2d 322 (1991)]; see *State* v. *Palmer,* 206 Conn. 40, 46, 536 A.2d 936 (1988)." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa,* 235 Conn. 145, 170, 665 A.2d 63 (1995). In applying this test to the trial court's instruction in the present case, we conclude that the instruction provided an evenhanded explanation of the relevant principles applicable to a criminal trial, including the appropriate emphasis on the vital concepts of the presumption of innocence and the state's burden of proof beyond a reasonable doubt. We agree with the state that the trial court's language attempted to explain the jury's obligation to reach a rational verdict rather than mandate a manner in which the jury was to find certain facts proven. Furthermore, we disagree with the defendant's contention that the challenged language shifted the burden of proof from the state. Since, therefore, the defendant has failed to demonstrate a constitutional violation, his claim must fail.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] See part I of this opinion for discussion of *Golding* doctrine.