STATE OF CONNECTICUT *v.* TYWAAN REEVES
(AC 19028)

O'Connell, C. J., and Foti and Healey, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued December 14, 1999—officially released April 18, 2000

*Jerald S. Barber*, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, was *Mary M. Galvin*, state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Tywaan Reeves, was found guilty, after a jury trial, of one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4),[2] one count of failure to appear in the first

---

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

degree in violation of General Statutes § 53a-172 (a)[3] and two counts of tampering with a witness in violation of General Statutes § 53a-151 (a).[4] This appeal followed.

On appeal, the defendant claims that the trial court acted improperly in unduly restricting his cross-examinations of the state's principal witnesses concerning their bias and motive in testifying against the defendant. We affirm the judgments of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. At approximately 6 p.m. on February 21, 1998, Marcus Russell, age seventeen, and his girlfriend, Shaluanda Elliot, age fourteen, were watching television at his apartment on Hilton Drive in West Haven. Shortly before 6:30 p.m., Russell and Elliot left his apartment to walk her to her home on Homeside Avenue. As they were walking, Russell and Elliot noticed that three black males were following them. Both Russell and Elliot recognized two of the individuals as the defendant and Willie Minor. Elliot also recognized the third individual as John Walton.[5] Russell told Elliot to keep walking. Both did so. When Russell and Elliot reached Glade Street, which was a few blocks from Homeside Avenue, they noticed that the three individuals who had been following them had disappeared. Shortly thereafter,

---

[3] General Statutes § 53a-172 (a) provides: "A person is guilty of failure to appear in the first degree when (1) while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear, or (2) while on probation for conviction of a felony, he wilfully fails to appear when legally called for a violation of probation hearing."

[4] General Statutes § 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding."

[5] Russell was not acquainted with Walton and did not recognize him.

however, when they had reached Terrace Street, they saw that the defendant and Minor had reappeared[6] behind them and were again following them.

When Russell and Elliot reached Homeside Avenue, the defendant shouted at them, "You all stop walking." Russell turned around and said, "What?" and continued walking. The defendant then said, "You all gots to stop walking. I'm going to shoot." The defendant approached them, and both Russell and Elliot saw a gun in his hand. He stated to Russell, "You violated me," and that he was going to "run [Russell's] jewels."[7] Both men wore dark jackets and masks that covered the lower half of their faces. Thereafter, the defendant held the gun against Russell's chest. At the defendant's direction, Minor "popped" a gold chain that Russell was wearing from around his neck. This chain had a round medallion with a depiction of the Virgin Mary on it and was worth approximately $600. Russell was also directed to remove a gold ring from his finger and to give it to the defendant. This ring had rubies and cubic zirconias on the band and a picture of the Virgin Mary on its face, and it was worth about $80. The defendant, telling Russell that he knew that he had more jewelry, checked Russell's wrists for bracelets, but found none. The defendant and Minor then fled toward Glade Street.

Both Russell and Elliot immediately ran the short distance to Elliot's house and told her mother, Luray Elliot, what had happened. Angered over this situation, Elliot's mother, Elliot, Russell and several neighbors went to Glade Street to try to find the defendant.[8]

---

[6] Walton did not reappear and he no longer had any part in the events that transpired subsequently.

[7] According to the evidence, in street talk "to violate" someone means to "disrespect" someone, "like [Russell] did something to [the defendant]." Also, in street talk, "run your jewels" or "run your stuff" means take your jewelry and give it to me, or it means you are being robbed.

[8] At that time, Elliot's mother did not know the defendant or Minor. She went to Glade Street because Russell and Elliot said that was the direction in which the defendant and Minor ran from the robbery scene and because she knew that the defendant "hung out" there.

In the meantime, the police were called and told of the robbery. David Cahill, an officer with the West Haven police department, was dispatched to the area. Upon his arrival, he spoke to Russell and Elliot, who told him that the defendant had robbed them at gunpoint. He learned that the two alleged robbers were black males, both dressed in dark coats and dark pants, and that they had worn masks that covered the lower half of their faces. He also got a description of the gold chain and the gold ring. Cahill was familiar with the defendant in that he lived in the area. The police dispatcher learned that the defendant lived at an apartment at 54 Glade Street and sent Officers Steven Viele and Pauline Sires, who had been in radio contact with Cahill, to that address to find him.

Cahill proceeded to the defendant's apartment on foot, but Viele and Sires arrived there before him. Emily Reeves, the defendant's grandmother, answered Sires' knock on the apartment door. Sires told her that the defendant was a suspect in a robbery that had just occurred and that they wanted her consent to search the apartment. She consented and pointed out the defendant's room for them. In that room, Viele and Sires observed two dark jackets, one on a bed and the other on the floor, which were similar to the jackets worn by the alleged robbers. The jackets later were determined to belong to the defendant and Minor.[9] The officers continued to search the bedroom, but the defendant was not there. In that bedroom there was a closet about six feet high and four feet to five feet wide, with sliding doors, one to each side. At the time Viele approached the closet, the right closet door was fully closed but the left door was fully opened. As he stood up from examining the right side of the closet, Viele

[9] When the defendant testified in his own behalf, he admitted that the black jacket on the bed was his. A city of New Haven infraction ticket issued to Minor was found in the other jacket, which was dark blue.

saw a piece of jewelry in front of a stack of clothes on a shelf. It was "very bright," it was "gold with clear stones" and "red colored stones on it," and the face of the ring . . . had an inscription of . . . the Virgin Mary." No gun was found during that search.

The police did not locate the defendant that night,[10] but apprehended him several days later on February 26, 1998. He posted a bond, and his trial was eventually set to begin on April 21, 1998.

In March, 1998, while the defendant was still out on bond, Elliot was with her mother in her mother's car on Glade Street when the defendant approached the car. He apologized to "her for sticking [Russell] up when [she] was with him," and he told her that "he wanted to be friends" and that "he was stupid for doing it."[11] Later, on April 20, 1998, after Russell had been subpoenaed to attend court on that day, which was when the defendant's trial was scheduled to commence, the defendant pulled up in a car as Russell was coming out of his house. The defendant got out and started to speak with Russell. After Russell told him that he had been subpoenaed, the defendant "asked him not to go to court and if [he] did to give a false statement." He also told Russell that "if [Russell] [needed] any money, he [would] give it to [him] and anything [he] wanted or needed or whatever." Russell rejected the defendant's offer. The next day, Russell told Joseph Zampano of the state's attorney's office about this incident.

On the day that the defendant had approached Russell, i.e., April 20, 1998, the defendant called Elliot's mother and told her that he knew that she and Elliot had been subpoenaed to go to court the next day. He

---

[10] The defendant did not come back to the Glade Street apartment that night or the next night.

[11] According to Elliot's mother, the defendant told Elliot that he was going to get a job and pay her back for the chain.

talked to her about their not saying they were sure it was him, and he wanted to know if Elliot had talked to the state's attorney. She said that Elliot had spoken with the state's attorney. He then wanted to know what Elliot had told the state's attorney, and her mother said that she did not know. The defendant said that he "needed" to know what she said "so he knew what he would be walking up against when he came into the courtroom." He went on to say that "it is not like I'm going to do anything to you guys, I just want to know what I am walking up against when I go into the courtroom." Elliot's mother said that she did not know what her daughter had said as she was not in the room with her. The defendant then asked her if Elliot was home because he wanted to speak with her. She replied that Elliot was not home.[12] The next day Elliot's mother reported this by telephone to Zampano at the state's attorney's office.

On April 21, 1998, the defendant went to court, but before his case was called for trial, he left the courthouse and did not return. The police found him on May 21, 1998, in New Haven and he was rearrested.[13]

Our analysis of the defendant's claim of improper restriction of his right of cross-examination is guided by familiar constitutional principles. "It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. U.S. Const., amends, VI, XIV . . . *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas,* 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) . . . . The primary interest secured by confrontation is the

---

[12] Although Elliot was at home, her mother did not want the defendant to speak with her.

[13] Between April 22, 1998, and May 5, 1998, the defendant had been living at his girlfriend's house in New Haven.

right to cross-examination; *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy,* 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky,* 195 Conn. 475, 481–82, 488 A.2d 1239 (1985). In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska,* [supra, 318]; *State* v. *Lubesky,* supra, 482." (Citation omitted; internal quotation marks omitted.) *State* v. *Beliveau,* 237 Conn. 576, 584–85, 678 A.2d 924 (1996).

The United States Supreme Court has stated: "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware* v. *Fensterer,* 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985); see *State* v. *Joyner,* 225 Conn. 450, 478, 625 A.2d 791 (1993); *State* v. *Jones,* 22 Conn. App. 665, 667, 578 A.2d 667 (1990). The *Beliveau* court also stated: "The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. *State* v. *Johnson,* 21 Conn. App. 291, 293, 573 A.2d 1218 (1990). Only relevant evidence may be elicited through cross-examination. *State* v. *Gaynor,* 182 Conn. 501, 509, 438 A.2d 749 (1980). The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either

certain or more probable. . . . *State* v. *Kelly*, 208 Conn. 365, 376, 545 A.2d 1048 (1988). . . . *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994)." (Internal quotation marks omitted.) *State* v. *Beliveau*, supra, 237 Conn. 585.

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. [*State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995)]; *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 569, 657 A.2d 212 (1995); *State* v. *Kelley*, supra, 229 Conn. 563; *State* v. *Hernandez*, 224 Conn. 196, 208, 618 A.2d 494 (1992) . . . ." (Citations omitted.) *State* v. *Beliveau*, supra, 237 Conn. 585–86. "The proffering party bears the burden of establishing the relevance of the offered testimony." Id., 586.[14]

" 'In determining whether a defendant's right of cross-examination has been unduly restricted, we consider

[14] In *State* v. *Beliveau*, supra, 237 Conn. 586, our Supreme Court stated: "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. *State* v. *Barnes*, supra, 232 Conn. 747; *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 571; *Hall* v. *Burns*, 213 Conn. 446, 452, 569 A.2d 10 (1990). Relevance may be established in one of three ways.

"First, the proffering party can make an offer of proof. See *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994); *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986). Second, the record can itself be adequate to establish the relevance of the proffered testimony. See *State* v. *Santiago*, 224 Conn. 325, 332, 618 A.2d 32 (1992); see also *State* v. *Pittman*, 209 Conn. 596, 602–605, 553 A.2d 155 (1989); *State* v. *Hackett*, 182 Conn. 511, 517–20, 438 A.2d 726 (1980). Third, the proffering party can establish a proper foundation for the testimony by stating a 'good faith belief' that there is an adequate factual basis for his or her inquiry. 'A good faith basis on the part of examining counsel as to the truth of the matter contained in questions propounded to a witness on cross-examination is required.' 1 C. McCormick, Evidence (4th Ed. 1992) § 49, p. 187. A cross-examiner may inquire into the motivation of a witness if he or she has a good faith belief that a factual predicate for the question exists. See *United States* v. *Peterson*, 808 F.2d 969, 978 (2d Cir. 1987); *State* v. *Barnes*, supra, 232 Conn. 747." See also *State* v. *Orhan*, 52 Conn. App. 231, 246, 726 A.2d 629 (1999).

the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.' *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986)." *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992).

"The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." (Citations omitted.) *State* v. *Gaynor*, supra, 182 Conn. 508; see also *State* v. *Thompson*, 191 Conn. 146, 148, 463 A.2d 611 (1983). We must, therefore, conduct a two-step analysis, determining first whether the cross-examination permitted to defense counsel comported with sixth amendment standards; see *Davis* v. *Alaska*, supra, 415 U.S. 308; and second, whether the trial court abused its discretion in restricting the scope of that cross-examination. *State* v. *Payne*, 219 Conn. 93, 111, 591 A.2d 1246 (1991); *State* v. *Castro*, 196 Conn. 421, 424–25, 493 A.2d 223 (1985); *State* v. *Gaynor*, supra, 510; *State* v. *Colon*, 28 Conn. App. 231, 235, 611 A.2d 902, cert. denied, 223 Conn. 922, 614 A.2d 827 (1992). "The constitutional standard is met when defense counsel is 'permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' *Davis* v. *Alaska*, supra, 318; *United States* v. *Vasilios*, [598 F.2d 387, 389 (5th Cir. 1979)]." *State* v. *Gaynor*, supra, 509.

"To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. *United States* v. *Elliott*, 571 F.2d 880, 909 (5th Cir. 1978); *Gordon* v. *United States*, 438 F.2d 858, 865 (5th Cir. 1971).

*State* v. *Gaynor*, supra, [182 Conn. 510]; see *State* v. *Shindell*, 195 Conn. 128, 141, 486 A.2d 637 (1985). Once it is established that the trial court's ruling on the scope of cross-examination is not constitutionally defective, this court will apply [e]very reasonable presumption . . . in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State* v. *Briggs*, 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980)." (Internal quotation marks omitted.) *State* v. *Castro*, supra, 196 Conn. 426; *State* v. *Cepeda*, 51 Conn. App. 409, 418, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999).

It is necessary here to set out certain additional facts. During the cross-examination of Elliot, the defendant asked who lived at her home at 29 Homeside Avenue besides her and her mother. She responded that her brother and sister lived there and gave their ages as twenty-one and sixteen, respectively. She was then asked, "And no one else resides at the house with you there?" The state objected on the ground of relevance. Thereafter, the jury was excused, Elliot left the courtroom and the court asked for an offer of proof on relevance. Defense counsel stated that "this matter involves a dispute between the alleged victim and [the defendant], and part of that dispute concerns the minor child that resides in the house, and that is the minor child of [Russell] and this witness, and I just wanted to establish that fact, you know, that plays a part in this matter." The court asked defense counsel to repeat what he had stated regarding the minor child of this witness. Counsel then stated that the child was Elliot's and Russell's, and that "there [have] been continuing disputes about that minor child and [the defendant], and I think that . . . part of the motivation here for this witness concerns that minor child." The court then stated: "So, you are trying to establish some animosity

between . . . Russell and [Elliot] and [the defendant]." Counsel agreed, stating: "Over . . . this minor child, yes sir."

At that time, the state asserted[16] that "there was no minor child at the time of the robbery," that it was not

[16] After the state's remarks, the colloquy proceeded as follows:

"[State's Attorney]: [T]he fact that any robbery victim has a child or doesn't have a child isn't relevant to credibility. That is her private business.

"The Court: The only thing I can understand is that if there was some animosity between this witness . . . and Marcus Russell and [the defendant], that there was some hard feelings between them that might give rise to a motive to testify falsely, I could see that as an issue of credibility.

"[State's Attorney]: Your Honor, if I could, because the court is operating in a vacuum here—

"The Court: Yes, I am.

"[State's Attorney]: Now, at the time of the robbery, in recent months when some of the tampering went on and the state is, you know, not going to get [into] the business with the child because I think it is not relevant here.

"Apparently, this defendant has told other people that he fathered the child. He has made up stories. He had his picture taken with her twin sister. There is no evidence of any relationship. This was created in recent months by the defendant, and I just don't think [that] without some substantial showing he should be allowed to get into that. If he claims he is the father of the child, then he should have a blood test today.

"The Court: Was the minor child living in the home at the time of the robbery?

"[State's Attorney]: The minor child was not born, Your Honor, at the time of the robbery. I have to count back. I don't think it was even conceived at the time of the robbery.

"The Court: Is that the case, [defense counsel]?

"[Defense Counsel]: Well, Your Honor, the events of this matter concerning February 21, 1997, and also the alleged tampering—

"[State's Attorney]: In fact, I can represent [that] it was not conceived at the time. I just want to make sure Your Honor is clear on the facts. It was not even a concern.

"The Court: Go ahead.

"[Defense Counsel]: And the charges also involved actions which occurred as late as April and July, April of this year; and part of this witness' motivation to testify here is her animosity toward my client concerning the alleged paternity dispute over her child. That is what I was trying to elicit, Your Honor. That part of her motive or bias today is the fact [of] that animosity toward my client based on his comments before her child.

"[State's Attorney]: Your Honor, I just want to make sure we are all on the same page here. Is counsel claiming there is a question on paternity of the child?

relevant, that it was far more prejudicial to Elliot and the state than it was probative, and that the minor child in question had not even been conceived, let alone born, at the time of the robbery. During the ensuing colloquy, the court asked defense counsel if there was any dispute that "this minor child was not in existence or conceived as of the date of the alleged robbery?" Defense counsel asked the court, "May I have a moment?" Defense counsel then stated, "No . . . . There is no dispute that the child was not there." The court then sustained the state's objection. Essentially, the court did so because the minor child had not even been conceived at the time of the robbery in February, 1997, and because the paternity rumors concocted by the defendant while he was in jail in 1998 were wholly irrelevant.

Elliot's mother testified for the state after her daughter's testimony had concluded. On direct examination, she testified that Russell was Elliot's boyfriend. On cross-examination, she admitted that she had so testified on her direct examination. Defense counsel then

"[Defense Counsel]: I'm not claiming that.

"[State's Attorney]: Absent that, and I'm glad to hear that, this is really, I think, highly inappropriate, intrusive and far more prejudicial to the state and to this witness than probative. I realize there may be some people who want to try to make an implication because a young person has a child that there is something wrong with that. That is her right, and that is her private business. And I think to intrude on that is really improper and really offensive to her, and it is offensive to me.

"The Court: It appears that—is there any dispute, [defense counsel], that this minor child was not in existence or conceived as of the date of the alleged robbery? Is that in dispute?

"[Defense Counsel]: May I have a moment, Your Honor. No, Your Honor. There is no dispute that the child was not there.

"The Court: Then the objection is sustained.

"[State's Attorney]: And, Your Honor, may I make a motion in limine. Any attempt to reopen this should be out of the presence of the jury.

"The Court: I think [defense counsel] understands the ruling. Should there be any change in circumstances, I think that this area is subject to be reopened for any reason, I would ask that you bring that to my attention in the absence of the jury."

asked, "They are more than that, aren't they?" She answered, "They are boyfriend and girlfriend." The next question was, "Aren't they just more than boyfriend and girlfriend?" She replied, "Yeah. They are boyfriend and girlfriend." At this point, the state objected and the court asked defense counsel, "What is the relevancy [of] that? Are you asking to get into the nature of their relationship?" Defense counsel said that he was.

The jury then was excused and Elliot's mother was asked to wait out in the hall.[16] Defense counsel maintained that Elliot's mother had given a statement to the police in which she said that the defendant "was going around town telling people that [the defendant] was the father of [Elliot's] daughter" and that Elliot's mother had said that she was "upset" about that. Defense counsel claimed "that because that goes to part of why this witness . . . Russell and . . . Elliot are creating this story and trying to get [the defendant] based on this, you know, their retribution, I guess, for harm to reputation." He maintained further that "these events," unlike his claim about the minor child being alive at the time of the robbery, "occurred around the time of this trial, the April 21st date, and again it goes directly to their motivation to come here and testify that—again, we claim it for that bias. It is relevant to their motivation and bias to testify against [the defendant]." The state objected, claiming that it was "highly prejudicial" and arose out of a scenario made up by the defendant. Defense counsel agreed with the court that the defendant's claim here was that Elliot's mother "had a motive or bias or prejudice to testify against [the defendant] concerning the events of April of '98 . . . because of what [the defendant] had been saying." The court then proposed, without any objection, that the appropriate way to resolve this claim was to have Elliot's mother return to the witness stand, in the absence of the jury,

---

[16] All the witnesses had been sequestered during trial.

and allow defense counsel to ask her whatever questions he saw fit after which the court would rule.

Thereupon, Elliot's mother was examined by the defendant and the state at some length. She conceded that she had been "upset" by the defendant telling people that he had slept with her daughter and that he was "discussing" the possibility that he was the father of Elliot's child. Elliot's mother testified also that she had first spoken to the defendant on about July 13, 1998, about these "rumors" when he called her from jail, where he had been incarcerated since his apprehension on May 21, 1998. According to Elliot's mother, this conversation included not only the defendant's "mouthing off" about being the father of Elliot's child, but also her telling him that "he better stop lying and stop making [her] daughter look like a whore." In addition, she stated that a photograph[17] the defendant used in spreading these "rumors" actually was a photograph of the defendant and Elliot's identical twin sister, not of the defendant and Elliot. Although Elliot's mother was "upset" by the "rumors," which she knew were not true, she felt that after she yelled at the defendant she was no longer "upset."

After hearing this testimony, the court ruled again that the proffered evidence at issue was irrelevant. As was the case with the minor child, the court believed that the time frame was persuasive. The court pointed out that the testimony of Elliot's mother about the events of April 20, 1998, took place some months before the defendant circulated rumors about sleeping with Elliot and fathering her child. Further, the court noted that Elliot's mother had reported these events concerning the defendant's tampering of April, 1998, within one day of their occurrence to Zampano of the state's attorney's office a number of months before the defen-

---

[17] This photograph had been taken before his 1998 incarceration.

dant even started the rumors. The court opined that the events about which Elliot's mother was testifying took place in April, 1998, which she reported immediately to Zampano, and that testimony could not have been influenced by the rumor testimony that was not created by the defendant until four months later in July, 1998.

The defendant, on appeal, argues that the court unduly restricted his cross-examination into the bias and motive of Elliot and her mother. In doing so, he raises a sixth amendment confrontation claim without having raised any such issue at trial. In like fashion, and for the first time, he joins this with a similar claim under our state constitution. In raising these constitutional claims for the first time on appeal he seeks review pursuant to the doctrine of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

On appeal, the claim for review must meet all four prongs of the *Golding* analysis to be successful. *State* v. *Krzywicki*, 39 Conn. App. 832, 836, 668 A.2d 387 (1995). "We are free, however, to dispose of the claim by focusing on the condition that appears most relevant under the circumstances of the case." *State* v. *Andrews*, 29 Conn. App. 533, 537, 616 A.2d 1148 (1992), cert. denied, 224 Conn. App. 924, 618 A.2d 531 (1993); see *State* v. *Pinnock*, 220 Conn. 765, 778, 601 A.2d 521 (1992); *State* v. *Golding*, supra, 213 Conn. 240; *State* v. *Dukes*, 29 Conn. App. 409, 421, 616 A.2d 800 (1992), cert. denied, 224 Conn. 928, 619 A.2d 851 (1993). "The defendant must show that his claim is of constitutional magnitude involving the violation of a fundamental constitutional right pursuant to the second prong of *Golding*. *State* v. *Golding*, supra, [239]." *State* v. *Krzywicki*, supra, 836. This, the defendant has not done.

The threshold question is whether the cross-examinations of Elliot and her mother by defense counsel satis-

fied the sixth amendment standard set out previously. Applying the principles set out earlier, we determine that the defendant's claim is not of constitutional magnitude but, rather, deals with an evidentiary question for which the standard of review is that of whether an abuse of discretion has been shown. We reach this determination cognizant of the fact that it must first be established that the court's rulings on the scope of cross-examination are not constitutionally defective before we can employ the abuse of discretion standard of review to what is then the propriety of an evidentiary claim. As to both Elliot and her mother, the defendant's claims prove to be evidentiary and not constitutional in nature.

As to both Elliot and her mother, the defendant was allowed cross-examination, as was his right, that could have elicited facts that would tend to show motive, interest, bias and prejudice. That right was not unduly restricted. It must be noted that the constitutional right of cross-examination guarantees the opportunity for effective cross-examination, and that does not mean cross-examination "that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware* v. *Fensterer*, supra, 474 U.S. 20. That right does not include, in a word, "unrestricted" cross-examination. Moreover, only relevant evidence can be elicited through cross-examination, and the court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. The matter of relevancy was clearly involved in the issue of both Elliot's and her mother's testimony. We agree with the time frame analysis of the trial court on the relevancy issues as to their testimony. This applies not only to the issue of the minor child, who was not even conceived at the time of the robbery, but to the rumors concerning the defendant sleeping with Elliot and being the father of her minor child, rumors the defendant concocted while

he was in jail. Permitting the defendant to reap the benefit of his own self-manufactured evidence[18] in advancing a constitutional argument is, to say the least, unusual if not bizarre.[19]

This is hardly a case where there was a "denial of all meaningful cross-examination into a legitimate area of inquiry [which would thus fail] to comport with constitutional standards under the confrontation clause." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 224 Conn. 331. Elliot's mother admitted during her examination by the state that she had been "angry" and "upset" with the defendant for confronting her daughter at gunpoint, but that she no longer felt that way. On cross-examination, she admitted that when the defendant called from jail in July, 1998, she "lied" in response to his query as to whether Elliot was at home. Defense counsel also asked her if she "lied about anything else," but did not follow up that question when an objection to it was overruled. Again, before the jury on cross-examination, Elliot's mother testified that she no longer was upset and did not hold any grudges against the defendant for robbing Elliot at gunpoint, but she still would not let him talk to her.

A review of all the evidence, particularly that of Elliot and her mother in the light of the excluded inquiries, shows that from the relevant evidence and the issues

[18] The evidence disclosed that a tape recording had been made of the defendant's telephone call on July 13, 1998, to Elliot's mother, in which these rumors were discussed.

[19] The defendant, who admitted to two felony convictions, testified in his own behalf. Not only did he deny, among other things, that a robbery took place as claimed, given the circumstance that the minor child involved was not even conceived at the time of the robbery serves also to point out the highly prejudicial effect to the state of allowing the defendant to pursue that line. Even relevant evidence that is sufficiently prejudicial may be excluded on cross-examination. See *State* v. *Booth*, 250 Conn. 611, 645–46, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); see also *State* v. *Stevenson*, 53 Conn. App. 551, 572, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999).

actually litigated, the defendant was not unduly restricted on his cross-examination. The evidence shows that he was allowed to expose to the jury the facts from which the jury, as the judges of credibility and finders of fact, could properly draw the necessary inferences to aid it in determining the reliability of the witnesses' testimony. We note that the defendant did not get into the tampering charges with Elliot, but only the robbery. It bears pointing out that Elliot's testimony about the robbery was essentially cumulative as well as corroborative of Russell's testimony. A reading of the transcript shows that the defendant was permitted a wide range of inquiry on cross-examination and that the challenged limitation did not prevent him from "sufficiently investigating." Thus, the constitutional requisites of the sixth amendment were adequately met.

Turning to the issue of whether the court abused its discretion in its challenged rulings on cross-examination, we decide that it did not. As we already have discussed, in light of the circumstances of the challenges and the rulings, the trial court reasonably could have concluded as it did. It is apparent that the court was aware that it had the right and "indeed, [the] duty, to exclude irrelevant evidence." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 219, 690 A.2d 1370 (1997), quoting *State* v. *Pratt*, 235 Conn. 595, 604, 669 A.2d 562 (1995). As noted, defense counsel had a wide range of inquiry on cross-examination. The defendant had the burden of showing that "the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Castro*, supra, 196 Conn. 426; see *State* v. *Bova*, supra, 220. He has not done so. The rulings, which were all on evidentiary matters, were proper. The trial court did not abuse its discretion and, therefore, did not violate the defendant's constitutional right to confrontation.

The judgments are affirmed.

In this opinion the other judges concurred.