# TYWAAN REEVES *v.* COMMISSIONER OF CORRECTION
## (AC 29457)

Beach, Robinson and Schaller, Js.

Argued October 27, 2009—officially released March 16, 2010

*Gennaro Bizzarro*, special public defender, for the appellant (petitioner).

*Toni M. Smith-Rosario*, senior assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Tywaan Reeves, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus and his motion to amend his petition for the third time. On appeal, the petitioner claims that the court (1) abused its discretion in denying the petition for certification, (2) improperly rejected his claim that his trial counsel and appellate counsel provided ineffective assistance of counsel and (3) abused its discretion in denying his motion for permission to file a third amended petition. We dismiss the appeal.

The following facts are necessary for resolution of the petitioner's appeal. On September 1, 1998, the jury found the petitioner guilty of robbery in the first degree in violation of General Statutes § 53a-134, failure to appear in violation of General Statutes § 53a-172 (a) and two counts of tampering with a witness in violation of General Statutes § 53a-151 (a).[1] The petitioner appealed to this court from the judgments of conviction,

---

[1] The petitioner was found not guilty of a fifth charge, larceny in the third degree in violation of General Statutes § 53a-124.

and we affirmed the judgments of the trial court. *State v. Reeves*, 57 Conn. App. 337, 748 A.2d 357 (2000).

The facts underlying the petitioner's convictions were set forth in *State v. Reeves*, supra, 57 Conn. App. 339–43. "At approximately 6 p.m. on February 21, [1997], Marcus Russell, age seventeen, and his girlfriend, Shaluanda Elliot, age fourteen . . . left his apartment to walk . . . to her home on Homeside Avenue [in West Haven]. As they were walking, Russell and Elliot noticed that three black males were following them. Both Russell and Elliot recognized two of the individuals as the [petitioner] and Willie Minor. Elliot also recognized the third individual as John Walton. Russell told Elliot to keep walking. Both did so. When Russell and Elliot reached Glade Street, which was a few blocks from Homeside Avenue, they noticed that the three individuals who had been following them had disappeared. Shortly thereafter, however, when they had reached Terrace Street, they saw that the [petitioner] and Minor had reappeared behind them and were again following them.

"When Russell and Elliot reached Homeside Avenue, the [petitioner] shouted at them, 'You all stop walking.' Russell turned around and said, 'What?' and continued walking. The [petitioner] then said, 'You all gots to stop walking. I'm going to shoot.' The [petitioner] approached them, and both Russell and Elliot saw a gun in his hand. He stated to Russell, 'You violated me,' and that he was going to 'run [Russell's] jewels.' Both men wore dark jackets and masks that covered the lower half of their faces. Thereafter, the [petitioner] held the gun against Russell's chest. At the [petitioner's] direction, Minor 'popped' a gold chain that Russell was wearing from around his neck. This chain had a round medallion with a depiction of the Virgin Mary on it and was worth approximately $600. Russell was also directed to remove a gold ring from his finger and to give it to the [petitioner]. This ring had rubies and cubic

zirconias on the band and a picture of the Virgin Mary on its face, and it was worth about $80. The [petitioner], telling Russell that he knew he had more jewelry, checked Russell's wrists for bracelets, but found none. The [petitioner] and Minor then fled toward Glade Street.

"Both Russell and Elliot immediately ran the short distance to Elliot's house and told her mother, Luray Elliot, what had happened. Angered over this situation, Elliot's mother, Elliot, Russell and several neighbors went to Glade Street to try to find the [petitioner].

"In the meantime, the police were called and told of the robbery. David Cahill, an officer with the West Haven police department, was dispatched to the area. Upon his arrival, he spoke to Russell and Elliot, who told him that the [petitioner] had robbed them at gunpoint. He learned that the two alleged robbers were black males, both dressed in dark coats and dark pants, and that they had worn masks that covered the lower half of their faces. He also got a description of the gold chain and the gold ring. Cahill was familiar with the [petitioner] in that he lived in the area. The police dispatcher learned that the [petitioner] lived at an apartment at 54 Glade Street and sent Officers Steven Viele and Pauline Sires, who had been in radio contact with Cahill, to that address to find him.

"Cahill proceeded to the [petitioner's] apartment on foot, but Viele and Sires arrived there before him. Emily Reeves, the [petitioner's] grandmother, answered Sires' knock on the apartment door. Sires told her that the [petitioner] was a suspect in a robbery that had just occurred and that they wanted her consent to search the apartment. She consented and pointed out the [petitioner's] room for them. In that room, Viele and Sires observed two dark jackets, one on the bed and the other on the floor, which were similar to the jackets

worn by the alleged robbers. The jackets later were determined to belong to the [petitioner] and Minor. The officers continued to search the bedroom, but the [petitioner] was not there. In that bedroom, there was a closet about six feet high and four to five feet wide, with sliding doors, one to each side. . . . As he stood up from examining the right side of the closet, Viele saw a piece of jewelry in front of a stack of clothes on a shelf. It was 'very bright,' it was 'gold with clear stones' and 'red colored stones on it,' and the face of the ring . . . had an inscription of . . . the Virgin Mary. No gun was found during that search.

"The police did not locate the [petitioner] that night, but apprehended him several days later on February 26, [1997]. He posted a bond, and his trial was eventually set to begin on April 21, 1998.

"In March, 1998, while the [petitioner] was still out on bond, Elliot was with her mother in her mother's car on Glade Street when the [petitioner] approached the car. He apologized to 'her for sticking [Russell] up when [she] was with him,' and he told her that 'he wanted to be friends' and that 'he was stupid for doing it.' Later, on April 20, 1998, after Russell had been sub-poenaed to attend court on that day, which was when the [petitioner's] trial was scheduled to commence, the [petitioner] pulled up in a car as Russell was coming out of his house. The [petitioner] got out and started to speak with Russell. After Russell told him that he had been subpoenaed, the [petitioner] 'asked him not to go to court and if [he] did to give a false statement.' He also told Russell that 'if [Russell] [needed] any money, he [would] give it to [him] and anything [he] wanted or needed or whatever.' Russell rejected the [petitioner's] offer. The next day, Russell told Joseph Zampano of the state's attorney's office about this incident.

"On the day that the [petitioner] had approached Russell, i.e., April 20, 1998, the [petitioner] called Elliot's mother and told her that he knew that she and Elliot had been subpoenaed to go to court the next day. He talked to her about their not saying they were sure it was him, and he wanted to know if Elliot had talked to the state's attorney. She said that Elliot had spoken with the state's attorney. He then wanted to know what Elliot had told the state's attorney, and her mother said that she did not know. The [petitioner] said that he 'needed' to know what she said 'so he knew what he would be walking up against when he came into the courtroom.' He went on to say that 'it is not like I'm going to do anything to you guys, I just want to know what I am walking up against when I go into the court-room.' Elliot's mother said that she did not know what her daughter had said as she was not in the room with her. The [petitioner] then asked her if Elliot was home because he wanted to speak with her. She replied that Elliot was not home. The next day Elliot's mother reported this by telephone to Zampano at the state's attorney's office.

"On April 21, 1998, the [petitioner] went to court, but before his case was called for trial, he left the court-house and did not return. The police found him on May 21, 1998, in New Haven and he was rearrested." Id.

After the petitioner's judgments of conviction were affirmed on appeal, the petitioner, representing himself, filed a petition for a writ of habeas corpus on December 11, 2005. His habeas counsel, Damon A. R. Kirschbaum, filed a second amended petition on December 29, 2006. In the second amended petition, the petitioner alleged that (1) his trial counsel, Jerald S. Barber, had rendered ineffective assistance of counsel, (2) his appellate counsel, also Barber, had rendered ineffective assistance of counsel and (3) the state had improperly failed to disclose material information at the criminal trial. The

habeas trial was held on the matter on September 10, 2007. At the outset of the proceedings, the court denied the petitioner's motion for permission to file a third amended petition for a writ of habeas corpus. The court then heard testimony from the petitioner and Barber. The court, *Swords, J.*, by memorandum of decision filed November 26, 2007, denied the habeas petition on the ground that the petitioner had failed to prove that Barber's performance was deficient as trial counsel or as appellate counsel.[2] On December 6, 2007, the habeas court denied the petitioner's petition for certification to appeal. This appeal followed.

When confronted with a denial of certification to appeal, we must determine whether this ruling constituted an abuse of discretion. *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). "A petitioner satisfies that substantial burden by demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Solman* v. *Commissioner of Correction*, 99 Conn. App. 640, 643, 916 A.2d 824, cert. denied, 282 Conn. 901, 918 A.2d 888 (2007). If the petitioner can show that the habeas court abused its discretion in denying the petition for certification to appeal, then the petitioner must demonstrate that the judgment of the habeas court should be reversed on its merits. See *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 564, 941 A.2d 248 (2008). To determine whether the court abused its discretion, we must consider the merits of the petitioner's underlying claims. *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 449, 936 A.2d 611 (2007).

---

[2] At the habeas trial, the petitioner withdrew a claim of prosecutorial impropriety.

I

The petitioner first asserts that the court improperly dismissed his numerous claims that his trial and appellate counsel rendered ineffective assistance. We disagree.

"For the petitioner to prevail on his claim of ineffective assistance of counsel, he must establish both that his counsel's performance was deficient and that there is a reasonable probability that, but for the counsel's mistakes, the result of the proceeding would have been different." (Internal quotation marks omitted.) *McClendon* v. *Commissioner of Correction*, 93 Conn. App. 228, 230, 888 A.2d 183, cert. denied, 277 Conn. 917, 895 A.2d 789 (2006); see also *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *McClellan* v. *Commissioner of Correction*, 103 Conn. App. 159, 161, 927 A.2d 992 (2007).

The petitioner claims that his trial counsel provided ineffective assistance by failing to introduce evidence of a drug dealing relationship between the petitioner and Russell. At the criminal trial, the petitioner testified that he had not robbed Russell but that Russell, in fact, had given the petitioner the jewelry as payment for a debt. The petitioner maintains that Barber should have allowed him to testify that Russell sold drugs for him and owed him money for drugs that were missing. The habeas court found that "Barber and [the] petitioner had extensive discussions on the issue of whether [the] petitioner should testify and the pros and cons of this testimony. [The] petitioner insisted that he wanted to

give the jury his own explanation for his possession of Russell's property. This explanation included a description of the drug dealing relationship between Russell and himself. Barber, however, advised [the] petitioner that his testimony about a drug debt owed to him by Russell ran the risk the jury would convict him notwithstanding any weaknesses in the state's case but merely because he was a drug dealer." Consequently, the habeas court found that "Barber thoroughly discussed the issue with the petitioner and weighed the potential benefit against any harm to the petitioner's case. The criminal trial transcript indicates that the absence of the evidence did not damage [the] petitioner's defense, and the introduction of the evidence would likely have been prejudicial. Thus, Barber exercised sound professional judgment in deciding against taking an unnecessary risk, and this court will not second-guess that trial strategy." The decision not to disclose the drug dealing relationship between the petitioner and Russell was guided by professional judgment, and we cannot say that the decision was so unsound as to constitute ineffective assistance. "We consistently have declined to second-guess such decisions." *Beverly* v. *Commissioner of Correction*, 101 Conn. App. 248, 252, 922 A.2d 178, cert. denied, 283 Conn. 907, 927 A.2d 916 (2007). Accordingly, we conclude that the court did not abuse its discretion in denying the petition for certification as to this claim.

Next, the petitioner claims that his trial counsel provided ineffective assistance by failing to introduce a transcript of a telephone conversation between the petitioner, Russell and Elliot's mother in order to impeach Russell, Elliot and her mother with evidence of their relationship to the petitioner. The court rejected the petitioner's claim because it found that (1) the petitioner failed to prove that the transcript would have been admitted at trial and (2) the transcript did not

affirmatively establish that the petitioner had a relationship with Russell, Elliot and her mother prior to the robbery. The court found that the petitioner had failed to prove that he was prejudiced when his trial counsel did not offer the transcript to impeach Russell and Elliot's mother. The transcript does not necessarily show any relationship between Elliot's mother and the petitioner prior to the time that the robbery occurred. Although the transcript may provide evidence that Russell knew the petitioner prior to the robbery, it could not be used to impeach Russell irrefutably because Russell admitted knowing the petitioner.[3] Had the transcript of the telephone conversation been admitted into evidence at the criminal trial, it would, with some degree of reasonable probability, likely have had virtually no impact, viewed in the entirety of the evidence, and would not have produced a different verdict. Our review of the record reveals that the petitioner did not present any credible evidence demonstrating that his trial counsel's representation fell below an objective standard of reasonableness.

The petitioner also maintains that his trial counsel failed to provide effective assistance by not requesting jury instructions on lesser included offenses. Specifically, the petitioner asserts that (1) his trial counsel should have permitted him to decide whether to request a lesser included offense charge and (2) to the extent that requesting a lesser included offense charge was a strategic decision for counsel to make, his trial counsel was ineffective in failing to request such a charge. The court credited Barber's testimony that he had discussed

---

[3] When asked about his relationship with the petitioner, Russell stated that he knew the petitioner: "I know his voice and eyes. It is not hard to identify somebody." Russell also stated that the petitioner "used to live on Glade Street and play basketball, and I would see him." Russell further stated that he knew the petitioner's first name, but not his last name, and had never spoken to him but had heard his voice.

using a lesser included offense charge with the petitioner, as he does with all his clients, and that the petitioner did not argue with his trial strategy. Barber also testified that not requesting a lesser included offense was a strategic decision based on the fact that the state's evidence on the elements of use of force and larceny was weak. Barber adopted a strategy designed to obtain a full acquittal on the robbery charge; the petitioner denied guilt and claimed that Russell had voluntarily given him the items to pay a debt. The habeas court specifically did not credit the petitioner's testimony that he did not discuss whether to include a lesser included offense charge in the jury instructions. The petitioner's argument that the decision to include a lesser included offense should be made solely by the defendant in a criminal case is unpersuasive. Our Supreme Court has held that "counsel's failure to request a lesser included offense instruction does not necessarily deprive a defendant of reasonably effective assistance of counsel. . . . It may be sound trial strategy not to request a lesser included offense instruction, hoping that the jury will simply return a not guilty verdict." (Citations omitted.) *Fair* v. *Warden*, 211 Conn. 398, 404, 559 A.2d 1094, cert. denied, 493 U.S. 981, 110 S. Ct. 512, 107 L. Ed. 2d 514 (1989). If the decision to not request a lesser included offense instruction may be part of the overall trial strategy to obtain a not guilty verdict, then clearly this decision is in the realm of strategy decisions to be made by the attorney. In this case, the petitioner's trial counsel stated that his decision not to request instructions on lesser included offenses was based on the defendant's claim of innocence as well as the strength of the state's case. The petitioner has not demonstrated that the issues are debatable among jurists of reason. Given the usual deference courts must afford to trial counsel's decisions when reviewing such claims, we cannot conclude that

the court abused its discretion in denying the petition for certification as to this claim.[4]

The petitioner also asserts that the court improperly dismissed his claims that his appellate counsel provided ineffective assistance because he failed to file a petition for certification to appeal to the Supreme Court after this court affirmed the trial court's judgments of conviction. The court rejected this claim because there were no issues in the appeal worthy of certification. Under our rules, "[c]ertification by the supreme court on petition by a party is not a matter of right but of sound judicial discretion and will be allowed only where there are special and important reasons therefor. . . ." Practice Book § 84-2.[5] The sole issue presented in the petitioner's direct appeal was that the trial court improperly restricted his cross-examination of the state's witnesses regarding their bias and motive for testifying. See *State* v. *Reeves*, supra, 57 Conn. App. 359–60. This issue was routine, the decision of this court was not in conflict

---

[4] It is also difficult to find prejudice. Juries are generally instructed to consider the greater charge first and to consider lesser included offenses only if they find the defendant not guilty of the greater charge. Because the jury in this case found the defendant guilty of the greater charge, at least in theory, the jury would not have reached lesser offenses in any event.

[5] Practice Book § 84-2 states: "Certification by the supreme court on petition by a party is not a matter of right but of sound judicial discretion and will be allowed only where there are special and important reasons therefor. The following, while neither controlling nor fully measuring the court's discretion, indicate the character of the reasons which will be considered:

"(1) Where the appellate court has decided a question of substance not theretofore determined by the supreme court or has decided it in a way probably not in accord with applicable decisions of the supreme court.

"(2) Where the decision under review is in conflict with other decisions of the appellate court.

"(3) Where the appellate court has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by any other court, as to call for an exercise of the supreme court's supervision.

"(4) Where a question of great public importance is involved.

"(5) Where the judges of the appellate panel are divided in their decision or, though concurring in the result, are unable to agree upon a common ground of decision."

with any other decision, and this court was unanimous in affirming the trial court's judgments. Certification was unlikely. Moreover, the petitioner conceded at the habeas trial that he could not prove to a reasonable probability that had the Supreme Court considered his appeal, the outcome would have been different. Thus, the petitioner's claim fails under both *Strickland* prongs. Because the petitioner has not met his burden under *Strickland*, this claim is not debatable among jurists of reason, a court could not resolve it in a different manner and it is not adequate to deserve encouragement to proceed further. Accordingly, the habeas court did not abuse its discretion when it concluded that the petitioner's appellate counsel was not ineffective in failing to file a petition for certification to appeal to our Supreme Court.

## II

The petitioner's final claim is that the court abused its discretion in denying certification to appeal as to whether the court abused its discretion when it denied the petitioner's motion for permission to file a third amended petition.[6] We begin our analysis of the petitioner's claim by setting forth the applicable standard of review. "We will not disturb a habeas court's grant or denial of permission to amend a pleading in the absence of a clear abuse of discretion." *Correia* v. *Rowland*, 263 Conn. 453, 472, 820 A.2d 1009 (2003). Practice Book § 23-32 states: "The petitioner may amend the petition at any time prior to the filing of the return. Following the return, any pleading may be amended with leave of the judicial authority for good cause shown." "While our courts have been liberal in permitting amendments . . . this liberality has limitations. Amendments should

---

[6] Our review of the record shows that the petitioner sent his third amended petition by facsimile one business day prior to the start of the habeas trial. The third amended petition was not filed with the court until the day of trial.

be made seasonably. Factors to be considered in passing on a motion to amend are the length of delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment." (Citation omitted; internal quotation marks omitted.) *Hasan* v. *Warden*, 27 Conn. App. 794, 798, 609 A.2d 1031, cert. denied, 233 Conn. 917, 614 A.2d 821 (1992). On the day of the habeas trial, more than seven months after the return was filed, the petitioner filed a motion to amend his petition for the third time, alleging instances of prosecutorial misconduct. Prior to filing his motion to amend his petition for the third time, the petitioner had ample time in which he could have sought the court's permission to amend his petition to include a new claim of prosecutorial impropriety. Instead, the petitioner sought to amend his petition on the day that the habeas trial was set to commence. The court, in the exercise of its discretion, denied the petitioner's motion to amend. In view of the last minute filing and the failure to show good cause, we conclude that the habeas court did not abuse its discretion in denying the motion to amend.

In light of the foregoing, we conclude that the petitioner has not demonstrated that the issues raised with regard to the court's denial of his petition for a writ of habeas corpus or its denial of his motion to amend his petition for the third time are debatable among jurists of reason, that a court could resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further. Having failed to satisfy any of these criteria, the petitioner cannot demonstrate that the court abused its discretion in denying the petition for certification to appeal. See *Simms* v. *Warden*, supra, 230 Conn. 616.

The appeal is dismissed.

In this opinion the other judges concurred.