******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ALLEN LAMONT JAMES *v.* COMMISSIONER OF
CORRECTION
(AC 37032)

Keller, Prescott and Pellegrino, Js.

*Argued December 1, 2016—officially released February 21, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Fuger, J.)

*April E. Brodeur*, assigned counsel, for the appellant (petitioner).

*Paul J. Narducci*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (respondent).

*Opinion*

PRESCOTT, J. The petitioner, Allen Lamont James, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court abused its discretion by denying his petition for certification to appeal and that the court improperly determined that his trial counsel did not provide ineffective assistance by failing to pursue the petitioner's trial objective or to seek a jury instruction on parental discipline/justification. Having thoroughly reviewed the record, we conclude that the habeas court properly denied the petition for certification to appeal. Accordingly, we dismiss the appeal.

The following facts, as set forth by this court on direct appeal, and procedural history are relevant to this appeal. "In the early morning hours of December 28, 2003, Sergeant Brett Mahoney of the Waterford police department saw a vehicle operated by the [petitioner], traveling from the Interstate 395 connector onto Route 32 at approximately 100 miles per hour. After a lengthy pursuit, Mahoney found the vehicle, with the front door open, stopped on a private driveway in front of a gate. The [petitioner] had fled into the surrounding wooded area. After Mahoney called for assistance, the [petitioner] was apprehended as he emerged from the wooded area and was brought back to the vehicle. A subsequent search of the wooded area yielded two plastic bags and a suitcase that contained the human remains of the [petitioner]'s child, Alquan, which the [petitioner] had taken out of the vehicle and left in the wooded area.

"After the [petitioner]'s arrest, and while he was in a police holding cell, he requested to speak with detectives. After being advised of his *Miranda* rights, the [petitioner] gave two distinctly different versions regarding Alquan's death.

"The first version was that Alquan had a tendency to fall and hit his head, and that in the summer or fall of 2000, Alquan had fallen down and hit his head on a bed railing. The [petitioner] took him out to a friend's car, where he turned blue, whereupon the [petitioner] took him back to his house and laid him down, but Alquan did not wake up. When asked whether he had ever struck Alquan, the [petitioner] admitted that he had done so but continued to insist that Alquan's death was an accident.

"The second version was in response to a question by the police as to whether Alquan's death was accidental, intentional, out of frustration or spontaneous. The [petitioner] said that it was spontaneous. He said that Alquan had not been listening to him and that he grabbed Alquan, threw him across the room and against the wall

two or three times, backhanded him across the chest or face, and manhandled him on the shoulder. He then administered chest compressions and attempted mouth-to-mouth resuscitation on Alquan, who did not respond. The [petitioner] did not seek medical attention for Alquan or call 911.

"The [petitioner] stated that after Alquan's death, he took his body in a suitcase to Santee, South Carolina, where he brought it to a vacant area, poured gasoline on it and lit it on fire. When the body did not burn, he put it into garbage bags, which he then put into a suitcase, put the suitcase into the trunk of his car, and eventually drove back to New London, where he kept the remains at his house. On several occasions, he had taken Alquan's body out for rides, which is what he was doing when he was apprehended on December 28, 2003. He stated that, while being pursued by the police, he stopped the car and brought the suitcase into the wooded area with the intent of turning himself in and later returning to retrieve the suitcase.

"The next day, on December 29, 2003, the [petitioner] again asked to speak with detectives. He then gave a third version of Alquan's death. This version was that he never intended to hurt Alquan but needed help in caring for him. He stated that Alquan was not eating and that the [petitioner] forced him to eat. When Alquan refused and spit out the food, the [petitioner] threw him on the bed, and Alquan bounced off and hit his head on the floor. He then forcibly pushed down on Alquan's shoulders, and Alquan hit his head on the floor. When Alquan did not get up, he tried to perform mouth-to-mouth resuscitation, but Alquan did not respond. He then repeated the story of bringing Alquan's body to South Carolina, unsuccessfully trying to burn it, and returning with it to Connecticut." (Footnotes omitted.) *State* v. *James*, 126 Conn. App. 221, 224–26, 11 A.3d 717, cert. denied, 300 Conn. 921, 14 A.3d 1005 (2011).

Thereafter, the petitioner "was charged in a substitute information with murder in violation of General Statutes § 53a-54a, capital felony in violation of General Statutes § 53a-54b (8), interfering with a police officer in violation of General Statutes (Rev. to 2003) § 53a-167a, engaging police in pursuit in violation of General Statutes § 14-223 (b) and reckless driving in violation of General Statutes § 14-222 (a)." Id., 223–24. "Through his own testimony at [his jury] trial, the [petitioner] gave a fourth version of Alquan's death. This version was that one Sunday afternoon, as he was about to feed Alquan, Alquan collapsed in his hands. He laid Alquan down for about five minutes and then tried to resuscitate him. He did not seek medical attention or call 911. He then drove to South Carolina, where he tried to burn Alquan's body. He also stated that he stomped on the body several times because it did not burn as he had anticipated.

"The state medical examiner and a forensic anthropologist examined Alquan's remains. This examination disclosed numerous fractures of various bones, including several fractures to the bones on each side of the head, fractures of the bone at the base of the skull, the lower jawbone, both collarbones, the second through the fifth ribs on the left side, and several finger bones. According to these witnesses, these injuries would have been caused by multiple blows and were inconsistent with falling from a bed or hitting one's head on a bed rail. According to the medical examiner, the cause of death was multiple blunt injuries and the manner of death was homicide.

"A medical examiner who also was an independent consultant dealing with forensic issues regarding deaths of children testified for the defense. After examining Alquan's pediatric medical records, statements, police reports, photographs, the reports of the state medical examiner and the state's forensic anthropologist, and Alquan's remains, she was unable to determine the cause or manner of Alquan's death because of the condition of the bones and the postmortem decomposition and disruption of the body, including the burning, stomping and movement of the body." Id., 227.

Following trial, the petitioner was found "guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3), and of interfering with an officer in violation of § 53a-167a, engaging police in pursuit in violation of § 14-223 and reckless driving in violation of § 14-222. The court rendered its judgment of conviction and sentenced the [petitioner] to an effective term of fourteen years of incarceration followed by four years of special parole." Id., 224. On direct appeal, this court affirmed the petitioner's judgment of conviction. Id., 231.

Thereafter, on July 12, 2011, the petitioner filed this habeas action. In a second amended petition for a writ of habeas corpus dated May 19, 2014, the petitioner alleged ineffective assistance of trial counsel.[1] More specifically, the petitioner claimed that the performance of his two trial attorneys, Bruce Sturman and M. Fred DeCaprio, was deficient because they failed to notify and consult with the petitioner regarding instructions on lesser included offenses that the court had decided sua sponte to give the jury, failed to adequately explain to him the impact of those instructions, failed to request a jury charge on parental discipline, and made statements during closing summation that indicated the petitioner's guilt as to the lesser included offenses. On June 3, 2014, the habeas court, *Fuger*, *J.*, held a trial at which it heard testimony from DeCaprio[2] and the petitioner.

Following the trial, the habeas court denied the petition for a writ of habeas corpus. In its written memoran-

dum of decision dated June 5, 2014, the court concluded that the decision of the petitioner's trial attorneys to acquiesce to the lesser included offense instruction without consulting him was not deficient performance because it was a "reasonable, prudent, and . . . sound tactical decision" belonging to defense counsel and not the client, and that the petitioner did not suffer prejudice by his defense counsel failing to request an instruction on parental justification because, given the facts of the case, it is unlikely the trial judge would have agreed to give such an instruction.[3] On June 13, 2013, the petitioner sought certification to appeal to this court, which the habeas court denied. This appeal followed. Additional facts will be set forth as necessary.

Prior to addressing the petitioner's claims on appeal, we set forth the applicable standard of review and guiding legal principles. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Riddick* v. *Commissioner of Correction*, 113 Conn. App. 456, 459, 966 A.2d 762, appeal dismissed, 301 Conn. 51, 19 A.3d 174 (2011). "In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Internal quotation marks omitted.) *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 544, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . [T]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law

and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment [to the United States constitution]. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . . It is well settled that [a] reviewing court can find against a petitioner on *either* ground, whichever is easier." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

I

The petitioner first claims that the habeas court improperly determined that the petitioner's trial counsel did not render ineffective assistance by failing to pursue the petitioner's trial objective to proceed "all or nothing" on the murder charges. Specifically, the petitioner argues that it was deficient performance for his trial counsel not to inform him of, nor consult with him about, the court's sua sponte decision to instruct the jury regarding lesser included offenses to murder, and that the habeas court used the wrong standard in conducting its analysis of this claim under the prejudice prong of the *Strickland* test. We are not persuaded.

The following additional facts and procedural history are relevant to this claim. At the underlying criminal trial, the judge instructed the jury on the offense of murder in violation of § 53a-54a (a)[4] and proceeded to state: "If, however, you unanimously find that the state has not proven each of the essential elements of the crime of murder, you shall then consider the lesser included offense of manslaughter in the first degree, § 53a-55 (a) (1), which offense I will now instruct you upon." Thereafter, having instructed the jury on § 53a-55 (a) (1), the judge continued: "If, however, you find that the state has failed to prove beyond a reasonable doubt each and every essential element of this lesser included offense, you shall then consider the separate lesser included offense of manslaughter in the first degree, § 53a-55 (a) (3), a separate crime which I will

now instruct you upon."[5]

At the habeas trial, the petitioner argued that because the client, not the attorney, "gets to pick the objective" of the case under the Rules of Professional Conduct, and because the inclusion of lesser included offenses in the jury instructions was not discussed with the petitioner, thereby undermining his objective to proceed "all or nothing" on the murder charges, "[t]here was either a disconnect or a lack of communication between the petitioner and his objective and his attorneys and their strategy" that constituted deficient performance under *Strickland*. In support of this claim, the petitioner offered the testimony of DeCaprio, who attested that the petitioner had discussed his objective of the case— which DeCaprio described as "to fight the charges and . . . be acquitted"—with defense counsel. When asked about the lesser included offense instruction given at trial, DeCaprio testified that he and his cocounsel had considered the strategy of including those instructions "early on, maybe before the trial even started," and concluded that they were appropriate because "the risk of going all or nothing in effect was huge in light of the facts that we had and that . . . one of our jobs as counsel was to make that decision and . . . we felt that that was the way to go."

In rejecting the petitioner's claim, the habeas court made the following findings of fact: "At the charging conference, the trial judge, [*Shimelman, J.*], informed both the prosecutors and the defense counsel that he, sua sponte, intended to give a lesser included offense instruction on manslaughter. . . . DeCaprio and Sturman concurred in that course of action." The habeas court also found that "[t]he petitioner . . . wanted to have this case presented as an 'all or none' proposition to the jury. He felt that he was not guilty of murdering his son and that if that was the decision that the jury had to make, then they would, of course, acquit him. His goal in this case was to be exonerated. . . . DeCaprio credibly testified that it is his practice to discuss jury instructions and closing arguments with his clients, however, he was unable to testify with any certainty that he did, in fact, do so in this particular case." Despite DeCaprio's uncertainty, the habeas court nevertheless concluded that even if defense counsel had not discussed the lesser included offense instruction with the petitioner, their failure to do so was "not dispositive of the issue" because "[j]ury instructions are clearly within the area of decisions made by lawyers." Moreover, the habeas court determined that it was not unreasonable for defense counsel to decline objecting to the trial court's decision to give the instruction sua sponte on the ground that they were "fearful that a jury would convict of murder if presented with an all or nothing proposition."

With regard to the first prong of the *Strickland* test,

"the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 688–89.

"[O]ur review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. . . . Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Citation omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 540–41, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016).

This court has previously "concluded in *Reeves* [v. *Commissioner of Correction*, 119 Conn. App. 852, 862, 989 A.2d 654, cert. denied, 296 Conn. 906, 992 A.2d 1135 (2010)] that the decision [of whether to request a lesser included offense instruction] is in the realm of strategy decisions to be made by the attorney." (Internal quotation marks omitted.) *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 526–27 n.11, 139 A.3d 798 (2016). Moreover, in evaluating such decisions, our appellate courts have looked to whether the decision was *reasonable* under the circumstances. See, e.g., *Fair* v. *Warden*, 211 Conn. 398, 405–406, 559 A.2d 1094, cert. denied, 493 U.S. 981, 110 S. Ct. 512, 107 L. Ed. 2d 514 (1989) ("[t]rial counsel . . . testified at the habeas hearing that he did not pursue a lesser included offense instruction because he believed there was overwhelming evidence supporting the robbery charge" and it was "very important for [him] to preserve some integrity with the jury" [internal quotation marks omitted]); *Franko* v. *Commissioner of Correction*, supra, 165

Conn. App. 524 ("the petitioner's trial counsel, by not seeking a lesser included offense instruction on unlawful restraint, tried to capitalize on the state's decision to charge the petitioner only with kidnapping in the second degree, which we determine to be a reasonable trial strategy"); *Reeves* v. *Commissioner of Correction*, supra, 119 Conn. App. 862 ("[i]t may be sound trial strategy not to request a lesser included offense instruction, hoping that the jury will simply return a not guilty verdict" [internal quotation marks omitted]); *McClam v. Commissioner of Correction*, 98 Conn. App. 432, 438, 909 A.2d 72 (2006), cert. denied, 281 Conn. 907, 916 A.2d 49 (2007) ("[o]n the basis of [the state's substantial] evidence, defense counsel requested that a lesser included offense be considered in order to afford the petitioner a more favorable outcome should the court find the state's case more convincing").

In the present case, therefore, defense counsel acted well within their authority by making the conscious decision not to object to the trial court's sua sponte instruction on lesser included offenses, because that decision "is in the realm of strategy decisions to be made by the attorney." (Internal quotation marks omitted.) *Franko* v. *Commissioner of Correction*, supra, 165 Conn. App. 526–27 n.11. Although "certain decisions regarding the exercise of waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate," i.e., the decision "to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," the decision to acquiesce to a lesser included offense instruction is not one of them, and thus the defense attorneys were not obligated to "both consult with the defendant and obtain consent to the recommended course of action." (Internal quotation marks omitted.) *Florida* v. *Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004).

Moreover, the petitioner is unable to overcome the strong presumption that the challenged strategic action might be considered reasonable under the circumstances. At the habeas trial, DeCaprio made clear that, due to the nature of the state's evidence against his client, defense counsel did not object to the lesser included offense instruction "in order to afford the petitioner a more favorable outcome should the court find the state's case more convincing," a motive that this court has previously deemed to be reasonable. *McClam v. Commissioner of Correction*, supra, 98 Conn. App. 438. As the habeas court noted, "[t]he facts of this particular case are horrendous, chilling, and bespeak cruelty and lack of respect for the life of poor Alquan. The bizarre act of keeping the victim's remains in a suitcase, taking them out for rides, the inconsistent explanations as to how the death occurred, and the long list of injuries this child suffered at the hands of the petitioner all add up to a strong likelihood that the petitioner was unlikely to get his wish and be totally

acquitted." In addition, DeCaprio testified that the decision to acquiesce to these instructions was not made hastily, as he and Sturman considered the strategy of including the instructions "early on, maybe before the trial even started." Accordingly, we conclude that the petitioner has failed to show that his defense counsels' performance was not sound trial strategy.

We acknowledge that the petitioner attempts to avert the aforementioned case law on lesser included offenses by framing this claim as one of trial counsel failing to advance the petitioner's case objective in derogation of the Rules of Professional Conduct. Rule 1.2 (a) of the Rules of Professional Conduct provides in relevant part: "[A] lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify. . . ." In response to this argument, we first point out that, at the habeas trial, DeCaprio testified that the petitioner's objective was "to fight the charges and . . . be acquitted," an objective that the habeas court concluded defense counsel indeed "forcibly" argued for during closing argument at the underlying criminal trial.[6] More significantly, however, we agree with the habeas court's assessment that this claim is merely "a more eloquently stated variation on the refrain that one hears frequently at habeas hearings where inmates state 'my lawyer works for me and has to do what I say.' . . . A lawyer [however] is not required to blindly follow the mandates of his or her client, although consultation with the client and explanation to the client goes a long way to prevent misunderstandings and bad feelings between lawyer and client." To conclude otherwise would broaden the scope of a client's objective to the point that it eliminates an attorney's ability to make many necessary and important professional and strategic decisions in the course of his or her representation.

In sum, the petitioner's claim founders on the performance prong of the *Strickland* test, and, therefore, we need not address the prejudice prong.[7] On the basis of this record, we are not persuaded that this claim is debatable among jurists of reason, that a court could resolve the issue in a different manner, and that the question deserves encouragement to proceed further. See *Simms* v. *Warden*, supra, 230 Conn. 616. Accordingly, we conclude that the court did not abuse its discretion by denying the petition for certification to appeal this claim.

II

The petitioner next claims that the habeas court improperly determined that the petitioner's trial coun-

sel did not render ineffective assistance by failing to seek a jury instruction on parental discipline/justification pursuant to General Statutes § 53a-18 (1) although the facts of the case supported it. In response, the respondent, the Commissioner of Correction, contends that defense counsels' decision not to seek the instruction was reasonable trial strategy, and that, even if they should have requested the instruction, it is not reasonably probable that the result of the underlying criminal trial would have been different. We agree with the respondent that the petitioner failed to satisfy the prejudice prong of the *Strickland* test.

The following additional facts and procedural history are relevant to this claim. At the habeas trial, DeCaprio testified that he and Sturman did not "seriously" consider seeking an instruction on parental justification because they did not think it was appropriate. He explained that this was due to "the nature of the facts that we've—that have already come out here and there also is the issue . . . of credibility of the defense," stating: "[T]he danger to me was that by requesting something like that, which we felt was based on, you know, many of the statements that were given based on some of the forensics, I think it would have seriously damaged the—the argument to the jury that this was, you know, accidental, which was really the thrust of it." Moreover, DeCaprio testified that although he believed the petitioner had indicated in some of his out-of-court statements to police that he had been disciplining Alquan when the child died, the petitioner did not do so on the witness stand at his underlying criminal trial, instead testifying for the jury that Alquan had collapsed in his arms.

Subsequent to the trial, the habeas court concluded: "Given the severity of the injuries sustained by the victim in this case [and] the statements . . . the petitioner made to the police, it is clear that whether or not the petitioner was attempting to discipline the victim, there is no way that one could find this to be 'reasonable physical force' as contemplated by . . . § 53a-18. Consequently it is most unlikely that even if requested Judge Shimelman would have given a parental discipline instruction."

The following legal principles guide our analysis of this claim. "With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine con-

fidence in the outcome. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) *Minor* v. *Commissioner of Correction*, 150 Conn. App. 756, 761–62, 92 A.4d 1008, cert. denied, 314 Conn. 903, 99 A.3d 1168 (2014).

General Statutes § 53a-18 provides in relevant part: "The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances: (1) A parent, guardian or other person entrusted with the care and supervision of a minor . . . may use reasonable physical force upon such minor . . . when and to the extent that he reasonably believes such to be necessary to maintain discipline or to promote the welfare of such minor . . . ." We highlight the fact that "[t]he commission to revise the criminal statutes, in drafting our Penal Code, specifically recommended that reasonable be inserted before physical force every time the latter phrase occurred in any justification provision. . . . [A]ny analysis of reasonableness must consider a variety of factors and . . . such an inquiry is case specific. Indeed this court has held that, [i]n determining . . . what is a reasonable punishment, various considerations must be regarded, the nature of the offence, the apparent motive and disposition of the offender, the influence of his example and conduct upon others, and the sex, age, size and strength of the pupil to be punished." (Citations omitted; internal quotation marks omitted.) *State* v. *Nathan J.*, 294 Conn. 243, 255–56, 982 A.2d 1067 (2009).

"[A] justification defense, including the parental justification defense, is an element of a criminal prosecution on which the state bears the burden of proof. . . . The defendant, however, bears the initial burden of producing sufficient evidence to warrant submitting a defense to the jury . . . but may rely on evidence adduced either by himself or by the state to meet this evidentiary threshold. . . . To satisfy this burden, the evidence adduced at trial must be sufficient to raise a reasonable doubt in the mind of a rational juror as to whether the defendant's actions were justified. . . . This burden is slight, however, and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 261–62. "[I]n reviewing the trial court's rejection of the defendant's request for a jury charge . . . we . . . adopt the version of the facts most favorable to the defendant [that] the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 836, 60 A.3d 246 (2013).

Turning to the present case, even if we were to

assume without deciding that the petitioner's trial counsel performed deficiently in failing to request an instruction on parental justification pursuant to § 53a-18 (1), the petitioner cannot succeed unless he also satisfies the prejudice prong of the *Strickland* test. Specifically, the petitioner has to show that there is a reasonable probability that the result of the trial would have been different. The habeas court found that there was no reasonable probability that the trial judge would have granted the request for the defense instruction under the evidence produced in this case.

As previously discussed in this opinion, although the petitioner testified to the jury that Alquan suddenly collapsed and died in his hands as the petitioner was about to feed him, two of the other three versions that the petitioner had given to police indicated that the petitioner used physical force in response to what he characterized as Alquan's misbehavior.[8] In one of those versions, the petitioner told police that "Alquan had not been listening to him and that he grabbed Alquan, threw him across the room and against the wall two or three times, backhanded him across the chest or face, and manhandled him on the shoulder." *State* v. *James*, supra, 126 Conn. App. 225–26. In the other, the petitioner told police that "Alquan was not eating and that the [petitioner] forced him to eat. When Alquan refused and spit out the food, the [petitioner] threw him on the bed, and Alquan bounced off and hit his head on the floor. He then forcibly pushed down on Alquan's shoulders, and Alquan hit his head on the floor." Id., 226.

In no way does this evidence, coupled with the evidence of Alquan's injuries, suggest that the petitioner's punishment of Alquan was *reasonable* under the circumstances. Alquan was a young child[9] at the time of his death; the petitioner was an adult man. Alquan allegedly did not comply with what the petitioner was asking of him; the petitioner allegedly responded, under either of these scenarios, with a violent assault by throwing Alquan's body, shoving his shoulders, and causing him head trauma.

It is difficult to imagine a situation in which a parent would ever be legally justified in using *deadly* physical force to discipline a child. See 59 Am. Jur. 2d 219, Parent and Child § 25 (2012) ("[i]n the context of a statute giving parents the right to use reasonable force to discipline their children, the use of force creating a substantial risk of death, serious bodily injury, disfigurement, or gross degradation is per se unreasonable when used for disciplinary purposes," citing *Simons* v. *State, Dept. of Human Services*, 803 N.W.2d 587, 594 [N.D. 2011]); see also *State* v. *Kimberly B.*, 699 N.W.2d 641, 649 (Wis. Ct. App. 2005). Because the petitioner could not meet his initial burden of producing sufficient evidence to warrant submitting a parental justification defense to the jury, there is not a reasonable probability that, even

if the petitioner's defense counsel had requested such an instruction, the trial judge would have granted it. Because there is not a reasonable probability that the trial judge would have given the instruction, the petitioner cannot show that there is a reasonable probability that the result of the proceeding would have been different.

On the basis of this record, this claim is not debatable among jurists of reason, a court could not resolve the issue in a different manner, and the question does not deserve encouragement to proceed further. We, therefore, conclude that the court did not abuse its discretion by denying the petition for certification to appeal this claim.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The petitioner's second amended petition also alleges a claim of ineffective assistance against his appellate counsel, but that claim was later withdrawn unilaterally by the petitioner, prior to the habeas trial.

[2] Habeas counsel for the petitioner indicated to the habeas court that Sturman, DeCaprio's cocounsel in the underlying criminal trial, had been subpoenaed to testify at the habeas trial, but was unavailable to attend because he was out of state. Because DeCaprio and Sturman had "made joint decisions; acted jointly" on the underlying case, however, the petitioner's habeas counsel stated that "it was [her] understanding that Attorney DeCaprio's testimony should be sufficient . . . ."

[3] The habeas court also concluded in its memorandum of decision that the petitioner was incorrect in asserting that his defense counsel argued during closing summation for his conviction on the lesser included offenses, because defense counsel never conceded such and forcibly argued for a total acquittal. That aspect of the claim is not being appealed in the present case.

[4] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[5] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[6] Specifically, the habeas court wrote in its memorandum of decision that although "[t]he closing argument does state that, at worst, the petitioner was reckless in his conduct towards the victim . . . Sturman in no way concedes that point. He argues forcibly for a total acquittal clearly addressing the murder charge."

[7] Because we do not reach the prejudice inquiry of the *Strickland* test, we need not decide the petitioner's claim that the habeas court applied the wrong standard by "requiring that the petitioner prove that he would have been acquitted" instead of requiring him to show "that there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different."

[8] We note that only portions of the transcripts from the underlying criminal proceeding were provided to the habeas court, thereby circumscribing our review of this matter. See *Santaniello* v. *Commissioner of Correction*, 152 Conn. App. 583, 589–90, 99 A.3d 1195, cert. denied, 314 Conn. 937, 102 A.3d 1115 (2014). Specifically, the petitioner did not submit to the habeas court any portions from his case-in-chief or the state's case-in-chief. Accordingly, the petitioner's characterization of the evidence presented at the underlying criminal trial, e.g., that one of his versions of Alquan's death included Alquan attempting to run out of a door into a busy street before being pulled back to safety by the petitioner, lacks support in this record.

[9] Based on the record from the underlying criminal trial, it appears that Alquan was between the ages of two and three and one-half years old, was about two and one-half to three feet tall, and weighed forty to sixty pounds.